

**FILED**
11/1/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

TD

AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Michael Maione (312) 353-4258

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

FREDDY GALINDO

CASE NUMBER: 24 CR 515

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about April 28, 2022, at Addison, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | knowingly possessed with intent to distribute a controlled substance. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*James J. Lee*

JAMES J. LEE
Special Agent, Drug Enforcement
Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: <u>November 1, 2024</u>

*Judge's signature*

City and state: <u>Chicago, Illinois</u>

<u>JEFFREY COLE, U.S. Magistrate Judge</u>
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS ⎰ ss

## **AFFIDAVIT**

I, JAMES J. LEE, being duly sworn, state as follows:

### **Background**

1.      I am a Special Agent with the Drug Enforcement Administration

("DEA") and have been so employed since approximately February 2012.[1] I am

---

[1]      On September 1, 2016, Special Agent James J. Lee appeared before a Magistrate Judge in the Northern District of Illinois as the affiant on an application for a search warrant to search the first-floor unit at 4601 South Albany, Chicago, Illinois. The Magistrate Judge issued the warrant and the DEA executed it the same day. During the evening of September 1, 2016, based on information regarding the execution of the warrant, Agent Lee and an AUSA who had assisted with the warrant realized that the search warrant affidavit contained inaccurate information. The government notified the Magistrate Judge about the inaccurate information in the search warrant application, stating:

> [P]aragraph 19 of the Affidavit submitted in support of the search warrant stated that "Agents saw De La TORRE exit his vehicle, enter through a gate door on 46th Street, and then enter the back door leading into the first floor of the Subject Premises." However, in fact, agents saw De La TORRE exit his vehicle, enter through a gate door on 46th Street [which was the courtyard gate door], and then disappear into the courtyard. Agents had surveillance on two visible doors to 4601 South Albany Ave. and believed that De La Torre went into the back door of 4601 South Albany Ave. that was not visible. In other words, the affidavit should have provided that agents believed that De La TORRE went into the back door based on the facts set forth above, rather than stating that they saw him enter that back door.

> Paragraph 20 of the Affidavit further stated that: "At approximately 5:54 p.m., surveillance agents observed De La TORRE exit the back door of the Subject Premises, walk to the alleyway behind the Subject Premises ...." That paragraph should have provided that agents observed De La TORRE exit the back *gate* door of the Subject Premises, not the back door of the Subject Premises.

After receiving this information, the Magistrate Judge told the government that she would not have signed the warrant if the surveillance had been accurately described by the agent, and that she expected the U.S. Attorney's Office to make a disclosure regarding SA Lee if he were going to testify or be an affiant on future complaints or warrants.

currently assigned to the DEA Chicago Field Division and my responsibilities include the investigation of criminal violations of federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, and 846. I have received training in criminal law, drug identification, and various investigative techniques. I am familiar with, and have participated in, undercover operations, physical and electronic surveillance, the debriefing of defendants and witnesses, search and arrest warrants, the management and use of informants, and the use of consensually recorded telephone calls, text messages, and physical meetings. I have participated in investigations that have resulted in the seizure of multiple types of controlled substances. Through my training and experience, as well as conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to import, transport, store, and distribute controlled substances.

2.      This affidavit is submitted in support of a criminal complaint alleging that on or about April 28, 2022, FREDDY GALINDO knowingly and intentionally possessed with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of

---

Later in the investigation, agents observed the same subject enter and exit the back door that was described in the original affidavit, and the subject admitted that he did in fact reside in the unit described in the affidavit. A DEA Office of Professional Responsibility investigation did not conclude that SA Lee knowingly and intentionally provided false information, and he was issued a non-disciplinary letter of caution for inattention to duty.

a criminal complaint charging GALINDO with possession with intent to distribute and distribute cocaine, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that GALINDO committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, my training and experience, my review of audio and video recordings, my consultation with other Spanish-speaking law enforcement officers who also reviewed audio and video recordings, my discussions with a DEA undercover officer ("UC-1"), information provided to me by other law enforcement agents, and other evidence. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## Facts Supporting Probable Cause

4. As outlined below, between on or about April 18, 2022 and on or about April 28, 2022, undercover law enforcement officers arranged the controlled purchase of five kilograms of cocaine from suspected narcotics traffickers. On or about April 28, 2022, GALINDO brought the five kilograms of cocaine to the prearranged meeting location to deliver to one of the undercover officers in exchange for cash.

**A.    An Undercover Officer Arranged To Buy Cocaine On or About April 28, 2024.**

5. According to DEA reports, on or about April 18, 2022, DEA agents provided an undercover phone number to a DEA Confidential Source ("CS-1"), along with instructions to pass it on to individuals who were looking to sell kilograms of

cocaine to customers in the Chicagoland area.[2] Later in the day, CS-1 stated that someone would call UC-1 in the coming days and would identify themselves as calling on behalf of "Mateo."

6.      According to DEA reports, on or about April 22, 2022 at approximately at 1:35 p.m., UC-1 received a recorded telephone call from an unidentified male ("UM-2"), who was using Mexican phone number 52-6442219549 (the "UM-2 Phone").[3] During the conversation, the following exchange occurred:

UC-1:      Hello.

UM-2:      Hello.

UC-1:      What's up, man?

UM-2:      Hey, Mateo gave me your... he gave me your number.

UC-1:      Oh, how are you, man?

---

[2] CS-1 was arrested in approximately April 2017 for conspiracy to distribute a controlled substance, and later sentenced in the United States District Court for the District of Rhode Island to 60 months' imprisonment and 24 months of supervised release. After CS-1 was released from prison in approximately 2021, CS-1 began cooperating with the DEA and is working for financial compensation. Since cooperating with the DEA, CS-1 has been paid approximately $92,350.

[3] Unless otherwise indicated, all the conversations and described herein were recorded by law enforcement. Some of the recorded conversations have been summarized, translated, and excerpted in this affidavit. Portions of these communications were in Spanish while others were in English. The language that is quoted from the recorded conversations is based upon a preliminary review of the recorded conversations, and not final transcripts. The times listed for the recorded conversations are approximate. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations. At various points, I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based upon information received from the UC, the contents and context of the recorded conversation, events that took place before and after the conversations, information received from a confidential source, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents.

| | |
|---|---|
| UM-2: | Good, just hanging out here. Hey, let's see... let's see, talk to me, how... what are you looking for? [What kind of drug are you looking for?] |
| UC-1: | Look, man, right now... right now the people are... are... they... they're asking me for Chinese food [heroin] and, uh, the... |
| UM-2: | Mm-hmm. |
| UC-1: | ...and the fine ones [cocaine]. But also easily...easily... |
| UM-2: | OK. |
| UC-1: | ...I can... I can s... I can move windows [methamphetamine], if you have any around there. But... |
| UM-2: | No, yeah, yeah, yeah, but, how... how much... |
| UC-1: | Go ahead. |
| UM-2: | ...are you looking for? |
| UC-1: | Look, I have... |
| UM-2: | How much are you looking for? |
| UC-1: | Look, I... I... I can easily, if... if the number's [price] right and, uh, and... and...and... |
| UM-2: | Let's see, let's talk about numbers. What nu... what... what number... what number are you interested in getting? Let's see...let's see if something can be done. |
| UC-1: | Uh, look, uh, well, they're [other suppliers are] giving me the fine ones [cocaine] for... for two eight [$28,000 per kilogram] right now. I've gotten them here. |
| UM-2: | For two eight [$28,000]? |
| UC-1: | I don't know if... Yeah, for two eight and easily... |
| UM-2: | At... for 28? |
| UC-1: | Yeah, 28, yeah. And easy... and easily... |

UM-2:      Mm-hmm.

UC-1:      ...I can... I can easily move between five and ten [kilograms] each... that... that... every 10, 15 days easily. Not a problem.

UM-2:      OK.

UC-1:      Uh...

UM-2:      Let's see, let's see, all right. And what about the... the one...

UC-1:      Go ahead.

UM-2:      ...and the China one [heroin], what... what number [price] are they giving you?

UC-1:      Uh, like between three two, three three, around there.

UM-2:      Two three?

UC-1:      Three... three two or, uh, three three, three two, around there.

UM-2:      Uh, are you talking about 32,000 [$32,000 per kilogram]?

UC-1:      Yeah, yeah, yeah.

UM-2:      The China white [heroin], 32,000?

UC-1:      Yeah, the... the whole one [one kilogram], yeah.

UM-2:      Oh, well, of course the whole one, we're not going to send you crap or even the other one. Why am I going to... why am I going to go round in circles...

UC-1:      [LAUGHS] Yeah, yeah, yeah, yeah. No, no, no. Of course, of course, of course.

UM-2:      ...why am I going to [U/I] Well, let's see...

UC-1:      Right?

UM-2:      Look, I already made... I made a deal the last time for the... Are you...? You want it in Chicago, right?

7

UC-1:      Yeah.

UM-2:     Do you need it in Chicago or in New York?

UC-1:      No, here in Chicago, in Los Vientos.

UM-2:     All right, in Los Vientos. One question.

UC-1:      Go ahead.

UM-2:     Do you have the paper [money] there?

UC-1:      Yes, sir.

7.     Based on my training and experience and the training and experience from other officers, I believe that in the above conversation, UM-2 asked UC-1: (1) what kind of narcotics UC-1 wanted to purchase ("what are you looking for?"); (2) what volume UC-1 wanted to purchase ("How much are you looking for?"); (3) the price at which UC-1 was willing to buy from UM-2 ("giving me the fine ones [cocaine] for... for two eight [$28,000] right now"); (4) where UC-1 wanted to receive the narcotics ("You want it in Chicago, right?" … "Do you need it in Chicago or in New York?") and (4) whether UC-1 had money with him in Chicago to complete the transaction ("Do you have the paper [money] there?").

8.     According to DEA reports, on or about April 27, 2022, at approximately 10:05 a.m., UC-1 received an incoming call from UM-2 on the UM-2 Phone. The following is a transcript of that call:

UC-1:      Hello.

UM-2:     What's up, Rolo?

UC-1:      Hey, what's going on? Sorry, man.

UM-2:       Hey.

UC-1:       Uh, wel... there's... there's some confusion, man. Well, first, I'm
            sorry because...

UM-2:       No, there's no confu... there's no confusion, let me explain it to
            you.

UC-1:       Go ahead.

UM-2:       The guy talked to you, he told you that he was going to be there
            in 15 days.

UC-1:       Yes, sir.

UM-2:       OK. All right. I told my buddy, Mateo, that I was going to get
            them some...[Narcotics]

UC-1:       Uh-huh.

UM-2:       ...from somewhere else so they had some there.

UC-1:       Uh-huh.

UM-2:       OK. So, another...

UC-1:       Uh-huh.

UM-2:       ...guy is going to call you, and he's going to call you in a little bit.

UC-1:       Ok
            .
UM-2:       And he's going to show you a little piece [a sample of narcotics]
            so you can look at it and see if you like it.

UC-1:       That's fine.

UM-2:       That's right, bu... but answer. Answer because seriously [U/I]
            really mad...

UC-1:       No, no, it's just like I told you, man. No, it's... well, so... so... no...
            it's... I work, I ha... had to do a small job earlier and...and I fell
            asleep, man, You were ca... you called me late.

| | |
|---|---|
| UM-2: | Mm. |
| UC-1: | And sorry for not answering, but also something else. |
| UM-2: | Yeah. |
| UC-1: | Just so you know, the other guy... |
| UM-2: | Yeah. |
| UC-1: | ...that told me in 15 days, he also told me and talk to him, ask him. He told me to... to... to work directly with him, to speak with him directly. Just so you know. So. Uh, if... |
| UM-2: | But t... th... that was with the e... e... |
| UC-1: | ...if you're getting it for me from somewhere else, that's fine, that's fine if you're getting it for me from somewhere else. |
| UM-2: | [U/I] No, it's... it's that one that told you to... |
| UC-1: | ...but the guy told me to talk to him to talk to him... |
| UM-2: | ...to talk directly... Yeah, but you're going to cal... he's going to... he's going to... he's going to call you in 15 days, right? |
| UC-1: | Yeah, yeah, yeah, yeah, yeah. |
| UM-2: | OK. This is the area code 928, it's the one we're going to wo... |
| UC-1: | And Mateo... and Mateo hadn't told me...and Mateo als... he... he hadn't told me that he was going to get it for me somewhere else. All right. Yeah. |
| UM-2: | Well, uh, look, you're going to ans... you're going to answer... |
| UC-1: | Either way it's fine. No, it's fine, I'm here, I'm here and tell the guy to call me here. |
| UM-2: | All right. |
| UC-1: | Here's... To call me and see... |
| UM-2: | Yeah, yeah, look. |

| | |
|---|---|
| UC-1: | ...if we can work something out. |
| UM-2: | Wh... what... how...? It's just that this number is going to work all of the time, it's mine. |
| UC-1: | Yeah. |
| UM-2: | And... and... and the 928 is going to call you, he's going to show you. In 15 days or before 15 days he's going to up there. |
| UC-1: | That's fine. |
| UM-2: | With that one... with the 928 is with... is the one we're going to work with all the time. |
| UC-1: | OK, OK, yeah. |
| UM-2: | Area code 928, all of the time. But if I call you from that number, answer it. There's no problem, because I want to see if, uh... |
| UC-1: | Yeah. |
| UM-2: | [U/I] I called that [U/I] something that... |
| UC-1: | And also... and also [U/I] I sent a mess... I sent a message on WhatsApp, I have it here, I... I... I already activated it just in case, send me... send me a message, or whatever. |
| UM-2: | Yeah, yeah, here [U/I] Go outside, make sure it's not your house. |
| UC-1: | Yeah. |
| UM-2: | Go outside and send me the location, just as long as it's not your house, as long as it's close by. So I can tell... tell him buddy how far away it is. |
| UC-1: | Oh, OK. That's fine. |
| UM-2: | From where they are in Chicago. |
| UC-1: | Yeah, yeah, I'll... I'll send it to you right away. |

| | |
|---|---|
| UM-2: | Yeah, yeah, look. Save th... this number because this guy's the one who's going to call you to say who's going to take you. You know? |
| UC-1: | Perfect. Yeah, here... here... I saved it here. |
| UM-2: | Yeah. Yeah, all right. Thanks so much and I'm sorry. No, it's just that [U/I] |
| UC-1: | Same to you. |
| UM-2: | It's just that earlier I just told him... I said. I just told him... I said... I told Mateo, "Hey, dude, I can't be talking because I also work [U/I]." |
| UC-1: | Yeah, no, no, I know, I know. And like I just told you, I also to... I told him... I told him... sorry, like I said, no, no, it was already late. And, but no, anyway I have the... the number here now. If you need anything give me a call. |
| UM-2: | Oh, all right. Here... here... here in a little bit they're going to... going to call you, answer the number that they call you from. If you don't reco... recognize it, answer it because they're going to call you and they're going take you a piece of cake [sample]. |
| UC-1: | [U/I] And... and it's... on... on behalf of Mateo? |
| UM-2: | They're going to... to... to tell you that it's on behalf of Mateo. |
| UC-1: | Perfect. OK. I'll wait for the call. |
| UM-2: | If they don't tell you that it's on behalf of Mate... if... if they don't say it's on behalf of Mateo, don't continue. |
| UC-1: | All right. Perfect. |
| UM-2: | I needs to be... it all has to be on behalf of Mateo. |
| UC-1: | Yeah, yeah, no, that's fine, that's fine. |
| UM-2: | All right, then, take care, [U/I]. |
| UC-1: | All right, then. Thanks. OK. See you later. |

UM-2:      All right.

9.      According to DEA reports, on or about April 27, 2022, at approximately 3:29 p.m., UC-1 received a call from UM-3 who was using telephone number (602) 773-8609 (the "UM-3 Phone"). During the call, the following exchange took place:

UC-1:      Hello.

UM-3:      Yeah, man. On behalf of [U/I]

UC-1:      Oh, yeah. How are you, man?

UM-3:      Good, good, man. We're here, you know. Putting in the work.

UC-1:      All right, all right. It's [U/I].

UM-3:      Hey, well, did they already... already... I don't know if they let you know. I mentioned it to the guys there, it looks like yeah, yeah, the... the thing [transaction] can be done there [in Chicago]. It's just that I don't know...

UC-1:      Um...

UM-3:      ...how you guys are.

UC-1:      U... u... um...

UM-3:      What?

UC-1:      The... the gu... the... Is the job here [Chicago], man, or... or is it there where you're at?

UM-3:      No, there... there with you, man.

UC-1:      OK. Uh, well, w... where is t... the... the... the guy at? Because I can see him tomorrow, man. Today he's... I'm... I'm picking up some, um... some documents [money], but tomorrow...

UM-3:      Yeah.

UC-1:      ...tomorrow I can see him t... Is he... the guy in the city or roughly where is he at?

UM-3:    Listen, if you want send me... send me where you're at there. Where you're at and I'll let the guy know, to see and I'll give you a call back. To see how far away he is.

UC-1:    All right, then. Right now... right... right now I'll send you [U/I]

UM-3:    Uh, um... Send it to me on WhatsApp there, man. It's all good.

UC-1:    All right, then, I'll send it to you right now.

UM-3:    Sounds good, man. We'll do it like that.

UC-1:    OK.

10.    According to DEA reports, at approximately 3:30 p.m. the same day, UC-1 sent a text message to the UM-3 Phone which read, "Addison, IL."

11.    According to DEA reports, at approximately 4:42 p.m. the same day, UC-1 received a call from UM-3, who was using the UM-3 Phone. During the call, the following conversation occurred:

UM-3:    Yeah, man.

UC-1:    Ta…talk to me

UM-3:    Hey, we're, uh, we're an... an hour away from you guys now, man.

UC-1:    OK.

UM-3:    I don't know if... I don't know... I don't know if... Uh, it is what they just confirmed to me just now. Tell the guy that we're an hour from the... from them. So, more than anything it's the... it's going to be the move [transport of the narcotics to the deal location], uh, you know?

UC-1:    Yeah, yeah, yeah.

UM-3:    Uh, what... what is going to be needed and... and, well, I don't know. They haven't told me anything about the move, right?

14

|  | But, I'm also not going to ask. If we're going to do it, we're going to do it, so, uh, well [U/I] |
|---|---|
| UC-1: | Yeah, uh, he had mentioned to me... to me that he was... he was going to bring me something to show me [a sample of narcotics] to see if the dance party was good to go, you know. |
| UM-3: | OK. |
| UC-1: | But whether the need was [U/I] but whether it was... it was needed, yeah, as long as everything goe... loo... looks good, tomorrow, um, if... if I meet you, let's assume tomorrow in the morning, well, like at 10:00, once traffic clears up, I can meet you later... |
| UM-3: | Yeah. |
| UC-1: | ...and the deal can be done tomorrow. You tell me, um, how you want to do it. |
| UM-3: | And... so, what... what is... what has he needed? Because he... |
| UC-1: | Um [U/I] of... of the premium ones [high quality], he had told me that about... about five [5 kilograms of cocaine] of them were going to needed, man. |
| UM-3: | Five? OK. |
| UC-1: | To start in [U/I] Yeah, and... |
| UM-3: | Sounds good. |
| UC-1: | ...um... and if everything turns out right fo... for... What... what's today? Wednesday. By Friday or Saturday, I can move another five [5 kilograms of cocaine] easy. No problem. |
| UM-3: | Sounds good. Then, good... good that...that... that [U/I] and there... I'll have a response back to you. |
| UC-1: | Yeah, talk with him to see... so that he or she or whatever can be get on the same page. If you want, have them call me to...to get on the same page because I'm struggling, man, because they're telling me, "They're going to call you." And then another person calls, "They're going to call you." |

15

| | |
|---|---|
| UM-3: | Yeah. |
| UC-1: | And then you call me, "No they're going to call you," and [U/I] and that way there's no hiccups [U/I] because if not... |
| UM-3: | Uh? |
| UC-1: | [U/I] like a dumb ass and um... |
| UM-3: | Yeah. |
| UC-1: | ...and I also don't want, understand? All right, then, there I [U/I] |
| UM-3: | You see, man, then, uh, listen, then, that's good, that... that you made that point because, for sure, fo... so that you're not looking elsewhere, then, it set already. Then... |
| UC-1: | OK. Sounds good, man. |
| UM-3: | ...right now [STUTTERS] Yeah, then, already... don't look elsewhere, then, I'm going to talk with the guy and for... so he can see you over in that side, you know. |
| UC-1: | All right, then, there [U/I] a... a pair. |
| UM-3: | And [STUTTERS]... it'll be tomorrow, everything first, boss and you're saying that in a few more days another of the same, right? |
| UC-1: | Yeah, yeah, tomorrow is good. |
| UM-3: | Sounds... sounds good, then, man. That's how we'll do it, then. |
| UC-1: | All right, then. |
| UM-3: | In case... in case... in case anything changes, man, I'll let you know, but everything sounds good. |
| UC-1: | Yeah, let me know...let me know today so... so I too can start getting things ready here so we won't be in a rush, man. You know that [U/I] fast... |
| UM-3: | All right. |

16

| UC-1: | ...thing... things don't end right. |
|---|---|
| UM-3: | Yeah. Y... you're ready and everything, just so that I can meet you, right? Everything is [U/I]? |
| UC-1: | Yeah, yeah, yeah, tomorrow like I said. |
| UM-3: | OK. |
| UC-1: | All right, then. |
| UM-3: | After 10:00 [10:00 a.m.]. |
| UC-1: | Let me know. |
| UM-3: | All right, then, you're set, then, man. |

12.    Based on my training and experience and the training and experience of other officers, and my knowledge of the investigation, I believe that in the above conversation: (1) UM-3 confirmed to UC-1 that he was approximately one hour away from Addison, Illinois; (2) UM-3 and UC-1 agreed that UM-3 was to give UC-1 a sample of cocaine first, and then UC-1 would purchase 5 kilograms of cocaine if the sample was acceptable; and (3) UC-1 and UM-3 agreed that, if the cocaine was of sufficient quality, UC-1 would also purchase an additional 5 kilograms of cocaine.

13.    According to DEA reports, the same day (on or about April 27, 2022), at approximately at 4:47 p.m., UC-1 received a telephone call from UM-3, who was using the UM-3 Phone. During the call, the following conversation took place:

| UC-1: | Hello. |
|---|---|
| UM-3: | Hey, the guy there just asked if it's a house there with you? Everything's fine, there, right? S... so as not to meet in the street, well, no. |
| UC-1: | What? |

| | |
|---|---|
| UM-3: | So as not to meet him in the street, well, said the guy there. Is everything fine there in the [U/I]? |
| UC-1: | Oh, yeah, yeah, we'll meet...we'll meet...yeah so... [STUTTERS] so if he wants tomorrow morning we'll get a little coffee, un, to have a good talk and... and I'll show him all the stuff [photos of the money that UC-1 intended to use to purchase the narcotics], then. It... it's there close by. |
| UM-3: | O... OK, so you'd get it, but you'd get it good, well, there at a house. Something like that, right? |
| UC-1: | Yeah, yeah, yeah, yeah, yeah. |
| UM-3: | Yeah, well, what... what he... what he takes care of, just as long as it's not in the street, just that, from there everything's fine. |
| UC-1: | No, no, no, no I... it's there where if... if you want I'll send him... I'll send the guy the address of a café around there, we'll meet there and... and afterwards, um, we can go by there just so that he sees straight away where the co... the... the office is and, um... and, um, so... so that he can go to pick up and... so we can coordinate there since he'll come back there a little later since... since we're ready, the guy can come there directly. |
| UM-3: | OK. Sounds good. Sounds... sounds good, man. I just wanted to clarify that there for you, to make it clear for you [U/I]. |
| UC-1: | Yeah, yeah, yeah. All right, then. |
| UM-3: | That's... that's fine, then, so... tomorrow, after 10:00, they're going to call you, man, tomorrow, after 10:00. |
| UC-1: | All right, then. |
| UM-3: | Hey, I... I... another question, uh, no, well, they... everything... everything's fine, everything's fine. I'll call you tomorrow after 10:00. |
| UC-1: | All right, then. |
| UM-3: | All right, then, man. Everything's fine. |

14.     Based on my training and experience and the training and experience of other officers, as well as my knowledge of the investigation, I believe in the above conversation, UM-3 asked UC-1 if they were meeting at a house instead of the street/public place and informed UC-1 that UM-3 would call UC-1 the next day after 10:00 a.m.

15.     According to DEA reports, at approximately 7:57 p.m. the same day, UC-1 received an incoming text message from the UM-3 Phone.[4] The text message read: "Listen can you go to Chicago?" UC-1 responded to UM-3's text message, "It's that I am coming from Carpentersville and Addison is half way." At approximately 10:22 p.m., UM-3 replied to UC-1's text message and stated, "All good sir the person [drug courier] is going to go to you tomorrow, have a good night."

**B.      On or about April 28, 2024, GALINDO Possessed Approximately Five Kilograms With Intent to Distribute It.**

16.     According to DEA reports, or about April 28, 2022, UC-1 received a text message from the UM-3 Phone. The text message read, "good morning they [the drug courier] are going to call on behalf of Compa. That is the person that is going to get close so you can be on alert." UC-1 responded to the text message, "Good morning. I will be waiting for the call."

17.     According to DEA reports, or about April 28, 2024, at approximately 8:48 a.m., UC-1 received an incoming call from an individual identifying himself as

---

[4] These text messages were in Spanish and translated to English. The language that is quoted is based upon a preliminary review of the recorded conversations, and not final translations.

"Guero," who was using telephone number (219) 302-4589 (the "Guero Phone"). The following is a transcript of the conversation:

| | |
|---|---|
| UC-1: | Hello. |
| GUERO: | Hey, what's up? Good morning. Uh... |
| UC-1: | Good morning. How are you, man? |
| GUERO: | The buddy Rey, the... I'm Guero, you know. |
| UC-1: | Oh, yeah, yeah, yeah. [PAUSE] Uh... |
| GUERO: | Uh, what was I going to say? |
| UC-1: | They... they let me know... Go ahead... |
| GUERO: | Uh-huh. |
| UC-1: | ...go ahead [U/I] |
| GUERO: | Yeah, uh, to... to see... no, I'm going to meet you at 9:00, right? |
| UC-1: | No, no, no, they told me... I... well, I can see you at 11:00. |
| GUERO: | Sorry, at 10:00. |
| UC-1: | No, at 11:00 would be better, since the traffic starts to calm down a little. What do you think? |
| GUERO: | Oh, at 11:00. OK. Yeah. That's fine. |
| UC-1: | Yeah, because you know right now the fucking traffic gets fucked up and it'd be better that way so we're not, uh, dealing with the traffic. What... what? Wh... wh...? What do you...? What do you think at like 11:00? |
| GUERO: | OK. Oh, that's fine. That's good that I called you beforehand, to tell... |
| UC-1: | Yeah. |
| GUERO: | ...the... the guy [the drug courier] to... to wait until 11:00. |

20

UC-1:      Yeah, that's better, yeah. Uh, I'm going to see him at... at... I'm going to see your guy [the drug courier], because I was also going to send mine [the UC's own courier] so he can... the Uber, well, so he can go pick that [the cocaine] up. Uh, um, do you want me to send the address or what... what do you think?

GUERO:     Uh, in fact they [UM-3 or his confederate] sent me the address to... to a... to a coffee shop.

UC-1:      Which... which one did they send you? Because I had just said...

GUERO:     To a coffee place, to... to Starbucks.

UC-1:      Is it at the Lake Street?

GUERO:     Honestly, I don't know. He told me that there only was [U/I]

UC-1:      OK. Sen... send it to me too just so I can confirm, uh, so there's no mistakes, you know. But, yeah, because I had told him about the coffee shop and I told him in a small town, in what small town, but there wasn't... I hadn't given him the... the address. I don't know if the guy checked there on the... on the I... on the internet and found the place, but, uh, I just sent it to me to... to...

GUERO:     Yeah, it's on Lake street.

UC-1:      ...to confirm. Yeah, on the Lake. All right, yeah, yeah.

GUERO:     But, yeah, but I'll... I'll send it to you anyway, it's... it's 1590. [1590 Lake Street, Addison, IL]

UC-1:      All right, yeah, yeah, that's it, that's it.

GUERO:     So, that's it?

UC-1:      Yeah, tell the guy [the drug courier] to be there at... at... at 11:00, I'll... I'll meet him there, uh, no matter what.

GUERO:     OK. Perfect, man. Uh, sounds good. So, that's how we'll do it, then.

UC-1:      All right, then. If you need anything...

GUERO:     So, call me... me here on this device.

UC-1:       Yeah, all right, then. Same to you.

GUERO:     All right, thanks.

UC-1:       Oh.

18.     Based on my training and experience and knowledge of the investigation, I believe UC-1 and GUERO agreed that a third, unidentified person would meet UC-1 near a coffee shop located at 1590 Lake Street in Addison, Illinois ("Location 1") at 11:00 on April 28, 2022, with the intention of conducting the above-described narcotics transaction at that time and place.

19.     According to DEA reports, at approximately 10:00 a.m. the same day (April 28, 2022), agents met with UC-1 and a second undercover agent ("UC-2") at a pre-determined meeting location. Agents planned to send UC-2 as a "runner" to pick up narcotics on behalf of UC-1 in accordance with the terms of the transaction described above. Agents equipped UC-2 with audio recording equipment.

20.     On or about April 28, 2024, at approximately 10:42 a.m., UC-1 received an incoming call from GUERO, who was using the "Guero Phone," during which the following conversation took place:

UC-1:       Hello.

GUERO:     Hey, um...

UC-1:       Yeah?

GUERO:     ...whe... when he's [UC-1's courier] about to get there, let me know, and also let me know what vehicle he's driving, so I can tell...

| | | |
|---|---|---|
| UC-1: | Uh-huh. | |
| GUERO: | ...the guy [the drug courier]. | |
| UC-1: | Yeah, yeah, the... the guy's [UC-2] going to arrive... he'll be there in around 15 minutes. It's just so... so you know. He's...he's [UC-2] on his way now. | |
| GUERO: | Uh. | |
| UC-1: | It's... it's just that I sent him [UC-2] ... | |
| GUERO: | Perfect, then. | |
| UC-1: | ...to run an errand, but yeah, he'll [UC-2] be there in about 15, and I... yeah, I'll let you know. What... what is your... your guy [the drug courier] driving? | |
| GUERO: | No, I don't know what he's driving. Um... | |
| UC-1: | Oh. | |
| GUERO: | ...I... I didn't see what car he took, but once he's there, he'll let me know. | |
| UC-1: | All right, then. | |
| GUERO: | All right, thanks. | |
| UC-1: | Bye. | |

21.     Based on my training and experience and the training and experience of other officers and my knowledge of the investigation, I believe that in the above conversation GUERO asked UC-1 to let GUERO know when UC-2 arrived at Location 1 so that GUERO could tell his courier. GUERO further stated that the courier would inform GUERO when the courier arrived at Location 1.

22.     According to DEA reports, at approximately 10:51 a.m., agents followed UC-2 as he traveled to meet GUERO's courier at Location 1.

23.     According to DEA reports, at approximately 10:53 a.m., UC-1 sent GUERO a text message at the Guero Phone that read, "5 min." GUERO replied, "Ok." UC-1 responded, "Toyota camry gray. He [UC-2] is a fat guy with a beard." UC-1 sent a follow up text, "In what car [what car is GUERO's courier driving?]" GUERO responded, "SUV gray ford." UC-1 then said, "ok." GUERO replied, "he [GUERO's courier] will arrive at 11:05." UC-1 responded, "He [UC-2] is parked in back." GUERO replied, "Ok."

24.     According to DEA reports, at approximately 10:56 a.m., surveillance agents observed UC-2 arrive at Location 1 and park in the rear of the building.

25.     According to DEA reports, at approximately 11:06 a.m., UC-1 received an incoming call from GUERO, who was using the Guero Phone, during which the following conversation occurred:

UC-1:     Hello.

GUERO:     [U/I] man. Uh, what was I going to say?

UC-1:     Go ahead.

GUERO:     So how... how do you want to do it? They... they told me to follow the dude's [UC-1's courier's] car, or something like that.

UC-1:     Yeah, yeah, yeah. T... t... the guy [GUERO's courier], u... uh, the guy is going to follow him [UC-1's courier]. Yeah. But when... so is the... so is the guy [GUERO's courier] already ready?

GUERO:     Yeah.

UC-1:     Oh, OK. Uh, oh, did you bring the photo [of the cocaine], man?

GUERO:     I don't have the photo, man.

UC-1:      Oh, are you... are you with the guy [GUERO's courier] that I was j... just talking to? Or... or was I talking to your...?

GUERO:     Yeah, with... yeah.

UC-1:      Oh, it's the same person, it's just that...

GUERO:     No, no, no. Yeah.

UC-1:      ...I didn't... I didn't save the number and...and since I couldn't... couldn't hear his voice. Uh... so, are you there or is your guy there?

GUERO:     No, it's my guy, man. Well, it's a... yeah, he's a friend. Yeah.

UC-1:      Oh. Yeah, yeah, yeah. And now... now because I'm wai... no, did he leave with...to see m... mine because my guy is waiting.

GUERO:     Yeah, in fact he told me that he was going to arrive today at 5:11, no, excuse me, at...at 11:05.

UC-1:      Yeah, yeah, the office is fi... in... in... five minutes away, you know.

GUERO:     OK, uh, what was I going to say?

UC-1:      So... so, tell him [GUERO's courier] to come over, uh, to come over with him. And then... then when they meet up and then... and then... then... they can take it [the picture of the cocaine] out. Well, the... the guy [UC-2] already knows what he needs to do.

GUERO:     Oh, OK. So... so, they can work it out then.

UC-1:      All right, all right, please.

GUERO:     It's my pleasure, there's a lot of trust here, you know, so you don't have to worry about anything.

UC-1:      Yeah, yeah, same to you, same to you. All right, then.

GUERO:     All... all right, thanks.

UC-1:      OK.

GUERO:     Bye.

26.     According to DEA reports, at approximately 11:07 a.m. the same day, surveillance agents observed a silver Ford SUV with Illinois license plates bearing number CK83000 ("Subject Vehicle 1") arrive in the parking lot and circle the lot.[5] Approximately three minutes later, surveillance agents observed Subject Vehicle 1 park next to UC-2's vehicle.

27.     According to DEA reports, at approximately 11:11 a.m., UC-2 exited his/her vehicle and entered the passenger seat of Subject Vehicle 1. The driver of Subject Vehicle 1 was later identified by UC-2 as GALINDO, as described in paragraph 41 herein. The following conversation occurred inside the vehicle and was recorded by the audio recording equipment worn by UC-2:

UC-2:       Hey, what?

GALINDO:   Hey, what's up?

UC-2:       How are you?

GALINDO:   Good, good. Look. [U/I] need all of it?

UC-2:       [U/I] How many? Are there five [5 kilos of cocaine] in here?

GALINDO:   Yeah.

UC-2:       And the photo [of the cocaine]? You didn't bring it to me? You only brought... you... you brought me the... five [5 kilograms of cocaine]?

GALINDO:   How so?

---

[5] Subject Vehicle 1 is registered to Individual A, who has the same last name as GALINDO, at the 1500 block of North 32nd Avenue in Melrose Park, Illinois.

UC-2:          Are those the five?

GALINDO:       How many [kilograms of cocaine] were they going to give you?

UC-2:          Well, they were going to give me a...a... a photo [of the cocaine]. A photo. The...

GALINDO:       They didn't say anything to me.

UC-2:          ...ju... just the... only the five?

GALINDO:       Yeah.

UC-2:          OK.

GALINDO:       And the cash?

UC-2:          OK. Because I don't have the money right now. That's why I have to...

GALINDO:       Oh.

UC-2:          ...go pick up the money.

GALINDO:       You need to give it to me, dude.

UC-2:          OK. Would you give me some time? About an hour?

GALINDO:       All right, that's fine, dude.

UC-2:          Yeah?

GALINDO:       Yeah.

UC-2:          OK. I'm going to go pick up some mo... some money now and then I'll come back, in about an hour.

GALINDO:       All right, then.

UC-2:          Because he told me a pho... a photo [of the cocaine].

GALINDO:       Yeah, no, it's all right.

UC-2:          OK?

GALINDO:   Yeah, it's all right.

UC-2:      Give me a chance, and then... I think I'll give you a call, OK?

GALINDO:   Sounds good.

28.     According to DEA reports, during this interaction, GALINDO handed UC-2 a backpack that had been sitting in the backseat. At approximately the time that UC-2 said, "I don't have the money right now" GALINDO took back the backpack. Based on my training and experience, the training and experience of other law enforcement officers, and my knowledge of the investigation, I believe that during the interaction between UC-2 and GALINDO inside Subject Vehicle 1: (1) GALINDO offered to sell UC-2 the cocaine located in the backseat of his car (see paragraph 41 below) when he said "need all of it?"; (2) GALINDO referred to 5 kilograms of cocaine when UC-2 asked him "only the five?" and GALINDO said "Yeah"; (3) GALINDO demanded cash payment in exchange for the cocaine in the backseat of his car when UC-2 said "I have to … go pick up the money" and GALINDO responded, "You need to give it to me, dude"; (4) GALINDO and UC-2 agreed that UC-2 would return to tender the purchase amount to GALINDO in one hour when UC-2 said, "I'm going to go pick up some mo... some money now and then I'll come back, in about an hour" and GALINDO said, "All right, then."

29.     According to DEA reports, approximately one minute after the conversation ended, surveillance agents observed UC-2 exit GALINDO's vehicle and enter UC-2's vehicle, then Subject Vehicle 1 departed the area, and surveillance agents followed.

30.     According to DEA reports, at approximately 11:17 a.m., surveillance agents observed GALINDO arrive at Playas Bar and Grill on the 500 block of West Lake Street in Addison, Illinois ("Location 2"), and park his vehicle. Surveillance agents observed GALINDO enter Location 2.

31.     At approximately 11:18 a.m., UC-1 received an incoming call from GUERO, who was using the Guero Phone, during which the following conversation occurred:

| | |
|---|---|
| UC-1: | Hello. |
| GUERO: | Hey, uh, the guy's telling me that... that he wants you to drop off those... those... those devices [money]. |
| UC-1: | No, no, no, you know, it's because there was confusion, I had let the... the... the...the other guy from Arizona, I had mentioned to you. About him, they had told me that they were going to give him a... they were going to give him a photo [of the cocaine]. And I told him, "Yeah, a photo and... and with... within an hour it'll... it'll ready. You just have to pass the test, then." He said, "No, no, that's fine." But I imagine that he didn't let you know. Right now the guy [UC-1's courier] has some for the two [kilograms of cocaine] and he went to pick up the money for the three [kilograms of cocaine]. In like 45 minutes it'll [the money will] be ready, to take it to the office [the place where the narcotics and money would be exchanged] in order not to do it there like... like... like a fucking moron in the street, like... like we had planned. But, um, but the guy, um, the... the... the... there's... Well, they had told me that he was going to show me a photo [of the cocaine]. |
| GUERO: | OK. |
| UC-1: | Ye... uh, but... from but to let it go... no, not like that... we don't work like that either. Uh, give me... give me like 45 minutes. The guy [UC-1's courier] knows. He showed your... your guy [courier], but he's bringing... he's bringing some [money] right now for two [kilograms of cocaine] because he went to pick it |

[the money] up and he's going, he's going to go to pick up the... the... the paper [money] for the other three [kilograms of cocaine]. And once he has everything, they're going to go to the office [place where the narcotics and money would be exchanged] so that you [U/I] count it and all that. [STATIC] [U/I] everything turns out... turns out... turns out fine, then.

GUERO:      Yeah, [U/I] yeah, it's because there was a mis... mis... misunderstanding I think, um...

UC-1:       Yeah.

GUERO:      ...we thought that everything was going to be over a handshake, you know. It's been without [U/I]

UC-1:       No, no, no, no, yeah, no, that's fine, no, there's no problem. Just tell your guy to...to give me 45 minutes and right... right there, uh, or if... or cross the street and I'll see him there in the theater to sh... so as to not meet at the same place and, uh...

GUERO:      It's that... it's that he's... my guy is far away, well, he doesn't... doesn't... doesn't...doesn't live close by.

UC-1:       Yeah, te... tell him to grab a taco there and that... th... I'll give him a... give him... give him a ti... a tip, then. Just have him wait there, there's a, uh, restaurant. Just have him grab a taco around there. Have him give me like 45 minutes and right then, right then, he'll see the guy again.

GUERO:      Oh, OK. Sounds good. S... so he... he's going to give...

UC-1:       Oh... oh...

GUERO:      ...he's going to give him two.

UC-1:       No, no, no, I... in 45 minutes when he sees him, he's going to follow him to the office...

GUERO:      OK.

UC-1:       ...and we're going to give it [the money] to him for the five [kilograms of cocaine], then.

GUERO:      Oh, OK. Sounds good.

UC-1:      In order to not do... to not make two trips. All right, then. Thanks.

GUERO:      OK. Bye. Sounds... sounds good [U/I]

UC-1:      Bye.

32.     Based on my training and experience and the training and experience of other officers, and my knowledge of the investigation, I believe in the above conversation, UC-1 and Guero agreed that GALINDO would wait in the area of Location 1 while UC-2 went to get enough cash to purchase 5 kilograms of narcotics ("[UC-1]: ... in 45 minutes when he see's him, he's going to follow him to the office GUERO: OK. UC-1: ..and we're going to give it to him for the five, then. GUERO: Oh, OK. Sounds good.").

33.     According to DEA reports, at approximately 11:42 a.m., UC-1 received an incoming phone call from UM-3, who was using the UM-3 Phone. The following is a transcript of the conversation:

UC-1:      Hello.

UM-3:      What's up, man?

UC-1:      Just here. What's up, man?

UM-3:      How are you?

UC-1:      Good, good, man, bu...

UM-3:      Did you already see the people [complete the transaction]?

UC-1:      Yeah, yeah, I did, but, uh, but there was a miscommunication because I... I... I sa... no... wasn't the guy supposed to bring me a picture [of the cocaine]? And the guy already came ready to... and th... my guy just, uh, had enough for two [kilograms of cocaine]. He has... has paper [money] for two [kilograms of

31

cocaine]. I told him to give me like 40 minutes. Now, now, right now I think he would be ready so they can see each other again and for him to follow him to the office, but um...

UM-3:     Oh, oh, OK. It's all good, man. Yeah, I thought I for sure gave that information, you know, but you know I'm with the people outside, you know. You understand? And... and those people are that guys, you know. So, there...

UC-1:     Yeah, yeah... yeah and... and... and now there... and there my guy...

UM-3:     ...but... but I... but...

UC-1:     ...my guy there told him that... letting him know that, weren't they going to give me a picture [of the cocaine]? And that guy, and the guy that came said, "Well, no, no, I... I already came ready." And he said, "Oh, shit." And my guy showed him there, he had there the... the... the paper for two.

UM-3:     Yeah.

UC-1:     But he told him, "Instead of doing two trips," it's better... he went to get some food and I told him to give me like 40 minutes...

UM-3:     OK.

UC-1:     ...to... to pick up [STUTTERS] the rest and... and that way they'll go to the offi...

UM-3:     Sounds good.

UC-1:     ...they'll go to the office and there he can count the... the paper and... and be done. But yeah right now in like... like 10, 15 minutes I think. What's that?

UM-3:     It's... listen, it's... it's... it's... it's good. Listen, so we don't get all tangled up, b... between him and you, we're going to have to communicate. I'll talk with the guy and between [U/I] we're going to understand and that's it, a big step with the paper and all that. Well, we'll... we'll talk about it with them there.

UC-1:     Yeah. Th... then...

UM-3:      Sound good?

UC-1:      ...then gi... then give me... then give me...I'll let you know when the guy is on his way so you can tell your guy.

UM-3:      Sounds good. L... just like that, we'll do it like that and for the paper or... or... or the material there now, well, we'll get it over to the guys over there. Everything good.

UC-1:      All right, then. Sounds good, then. OK. Thanks.

UM-3:      A... a... all right, then, OK. Let's keep moving forward. All good.

UC-1:      You too.

34.     According to DEA reports, at approximately 11:44 a.m., UC-1 and UM-3 exchanged a series of text messages. UC-1 sent UM-3 a text which read, "Tell the people that my guy will arrive at the coffee shop in 10 minutes." "And from there they can go to the office." UM-3 replied, "Ok."

35.     According to DEA reports, at approximately 11:52 a.m., UC-1 received an incoming phone call from UM-3, who was using the UM-3 Phone. The following is a transcript of the conversation:

UC-1:      Hello.

UM-3:      Yeah, hey. Are... are you guys ready then?

UC-1:      Yeah, the guy [UC-2] is arriving there. T... there in the same place you saw him. Tell the guy [the drug courier]...

UM-3:      Yeah.

UC-1:      ...to pull up there. From there the office [place where the narcotics and money would be exchanged] is like three, four minutes.

UM-3:    OK. But you're already ready there, right? You... you... you... you... you guys already met and talked? You're already... already ready to come back?

UC-1:    Yeah. Yeah, yeah, already... in being ready... already... that's it, that's it. Yeah already.

UM-3:    OK. Yeah, because, well, there's already...already too many trips, he can't... can't...can't... can't be doing that either, man.

UC-1:    No, no, no, of... no, he's al... al... already coming...

UM-3:    Yeah. You understand, don't you?

UC-1:    He's already... already has the paper [money] for the five [kilograms of cocaine], um, like I told you, he only had two and he went for the rest and from there to go see it, he just needs to follow him to the office and they'll go in. It's a house and, um, the guy can so he can count it right, so that he can see that everything is there...everything's in order. And do you think...?

UM-3:    Al... all right, then. Then and...

UC-1:    Do you think that on Saturday they can do another five [kilograms of cocaine], man?

UM-3:    Uh, I think so, man. But let's do... let's finish up with this first. Let's go and do what's pending first, man.

UC-1:    No, no, no, yeah, that's fine. Yeah, that's fine, that's fine. All right, then. OK.

UM-3:    Yeah? A... a... all right, then. Everything's good.

UC-1:    OK.

36.    According to DEA reports, at approximately 12:05 p.m., UC-1 placed a call to UM-3, who was using the UM-3 Phone, during which the following conversation took place:

UM-3:    Hello.

UC-1:      Hey, are you on your way, man? Because the guy's here waiting. You... you... you haven't shown up.

UM-3:      Uh, let me call him, man, let me call him.

UC-1:      All... all right, then.

37.     According to DEA reports, at approximately 12:13 p.m., UC-1 placed an outgoing call to "Guero," who was using the Guero Phone, during which the following conversation took place:

GUERO:     Hello.

UC-1:      What's up, man?

GUERO:     Just hanging out here. Relaxing. How's it going?

UC-1:      Hey, u... uh... no... did... did they let you know that my guy [UC-2] is waiting there?

GUERO:     No, man, they didn't tell me.

UC-1:      Look, uh, I... they p... I'm telling you, man, just fucking confusion. T... the guy from Arizona called me. He to... I explained to him that you... you already saw it, but he didn't bring the picture [of the cocaine]. But there' s no problem, just to give him 45 minutes. "And no, no, that's fine." He said, "Something [U/I] went wrong." "No... no problem," I told him, "that's fine." And then I told him, "You..." He said to me, "You know what? So there aren't... aren't anymore mistakes, you call me directly and I'll let them know." "All right." I've been l... letting him know for half an hour now that the guy is there waiting and I told him that...

GUERO:     Seriously, dude? In fact, right now... right now...

UC-1:      He's there.

GUERO:     ...I... I already [U/I] text to you.

UC-1:       Yeah, tell... tell... tell the guy [the drug courier] that he's [UC-2] there waiting, because he's already... he was about to leave, I said. And then the guy from Arizona just told me.

GUERO:      Oh.

UC-1:       He said, "You know what? You better call him."

GUERO:      OK.

UC-1:       I said, "Oh, damn." OK. Then, let him know.

GUERO:      OK. So... so, I'll let...

UC-1:       He's there.

GUERO:      ...my guy know, uh...

UC-1:       At the same place, he's there.

GUERO:      ...so, he's ready, he's ready with the paper [money], right? To tell them.

UC-1:       If... if... if you want to make the change there, it's fine, but if not, the office is fou...like four minutes away. What... whatever you think.

GUERO:      Look, to be honest with you, I think it would be better for exchange, uh, the changes can be done there. If you want your... your guy can go up there with my guy.

UC-1:       Uh-huh.

GUERO:      If... if you want to check there, you can open whatever you need to check...

UC-1:       Good.

GUERO:      ...look at it and if... if the guy [UC-1's courier] says that...that it's good, grab your things [the cocaine], he can go, and I'll leave with my things [money].

UC-1:       All right, then, that's how we'll do it.

GUERO:      Perfect? All right, thanks.

UC-1:       All right, then. OK

GUERO:    All right. Sounds good. Bye.

38.    According to DEA reports, at approximately 12:18 p.m., UC-1 placed an outgoing call to "Guero," who was using the Guero Phone, during which the following conversation occurred:

UC-1:       Hello.

GUERO:    Hey, the... the guy [GUERO's courier] is already going over there [Location 2]. He was eating. I think that he pays the bill and that, and he leaves.

UC-1:       All right, then.

GUERO:    Hey, one more thing, um...

UC-1:       Uh, talk to me.

GUERO:    ...uh, the guy says that it's better at the office [place where the narcotics and money would be exchanged]. So...

UC-1:       OK.

GUERO:    ...if you want say, tell you guy...

UC-1:       Yeah, like I'm telling you it's...

GUERO:    Yeah.

UC-1:       Uh-huh.

GUERO:    Tell your guy that...

UC-1:       Uh-huh.

GUERO:    ...that went they meet, tell him to follow him.

UC-1:       Yeah, he's... he's four minutes out, man. So, he's... he's close. So, it's good. He... he just gets there and from there to... to follow him. It's good.

GUERO:      Oh, OK. Hey, and sorry...

UC-1:       Huh.

GUERO:      ...for all the confusion, man, no, it's not our fault.

UC-1:       No, no. it's fine. It's... and... and I know too, um, I was just talking with that guy, I said him, "It's a lack of communication." I... I... I don't have a problem with you. We're speaking directly, but that other guy that was going to let you know...

GUERO:      Well, uh... of...

UC-1:       ...and he didn't let you know and we've been waiting here and that...

GUERO:      ...of... in fact, um, in fact, um, yeah, because he told me... me one thing and I told him, "Hey, no, but the person told you that they were going for the paper [money] and, well, we already planned it out." And he said...

UC-1:       Yeah.

GUERO:      ..."No because we..." And shit. Uh, well, that's fine...

UC-1:       [U/I]

GUERO:      ...man, we can do it however you would like. I mean, if you say like this, we'll do it like that.

UC-1:       Yeah. Exactly. OK. Sounds good. So, there I...

GUERO:      Right? And already... already... but... when you already [U/I] different ways. But however you would like.

UC-1:       All right, then.

GUERO:      There's no problem. We're on the same page.

UC-1:       OK. Thanks.

GUERO:      All right, thank you, man. [U/I]

UC-1:       O... OK.

39.     According to DEA reports, at approximately 12:23 p.m., surveillance agents observed GALINDO exit Location 2, enter his vehicle, and drive westbound on Lake Street.

40.     According to DEA reports, at approximately 12:24 p.m., UC-1 received a text message from "Guero," who was using the Guero Phone. The text message read, "in 11 minutes he [GALINDO] will arrive." UC-1 responded, "Ok."

41.     According to law enforcement reports, at approximately 12:27 p.m., law enforcement officers conducted a traffic stop on Subject Vehicle 1 for speeding and for an illegal dark tint on the 900 block of West Lake Street in Addison, Illinois. GALINDO identified himself as the driver of the car, but he was not able to produce a valid driver's license during the stop. At approximately 12:32 p.m., officers placed GALINDO under arrest for driving without a valid driver's license. According to DEA reports, after GALINDO's arrest, UC-2 positively identified GALINDO as the individual he spoke with in Subject Vehicle 1.

42.     According to law enforcement reports, at approximately 12:37 p.m., during an inventory search of Subject Vehicle 1, officers located a black backpack and discovered 5 brick shaped objects inside weighing approximately 5 kilograms that appeared to contain cocaine. A picture of the cocaine as it appeared in the bag is included below:



43.     According to DEA reports, the suspected cocaine was later submitted to the DEA North Central Lab for analysis. The DEA North Central Lab determined that the 5 brick shaped objects consisted of a mixture and substance containing cocaine and weighing 5,008.6 grams.

## Conclusion

44.    Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about April 28, 2022, GALINDO did knowingly and intentionally possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT

*James J. Lee*

JAMES J. LEE
Special Agent, Drug Enforcement
Administration

SWORN TO AND AFFIRMED by telephone on this 1st day of November, 2024.

Honorable Jeffrey Cole
United States Magistrate Judge